## KING *v.* THE STATE.

Incriminatory admissions and confessions are not admissible if there is evidence, arising from the testimony as to the circumstances under which the confession was made, that the making of the confession was induced by the slightest hope of benefit or the remotest fear of injury.
    No. 3366. JUNE 7, 1923.
Certiorari; from Court of Appeals. 28 *Ga. App.* 751.

King was indicted for setting fire to a house at No. 25 Fortress Avenue in Atlanta, Georgia, which he had purchased but had not paid for. This house was insured in all for $1100, and contained furniture and other personal property on which the accused had taken out a policy for $700 of insurance. The house was burned on the night of April 2, 1922. Prior to the fire the accused had sent his wife to the home of her father in Tifton, Georgia, because he was out of employment in Atlanta. The accused was seen at the house which burned, between 7 and 7:30 o'clock on the night of the fire; and the alarm was sent in about 9:36 p. m., according to the testimony of the firemen. After the flames had been extinguished one of the firemen made an examination of the house, and detected the odor of kerosene arising from the closet; and from the circumstances detailed by him it was his opinion that the fire originated in the closet and burned slowly up or within the

walls until it came in contact with the air, or the air was admitted by the burning, after which it burned rapidly. This witness testified that the entire roof was aflame and that two nearby homes were afire at the time the fire department reached the scene. On April 5, the defendant King wrote a letter addressed to Hon. J. Albert Sharp, State Fire Inspector, Atlanta, Georgia, stating that at the time he bought the place there was only $600 insurance on .it, and, as this was only about $100.00 more than the loan, that he had procured additional insurance for $500, which he thought was to be made payable to Mrs. Howard Sewell, but which policy had, by mistake of the agent, been issued in the name of his wife instead of Mrs. Sewell. By the letter the fire inspector was also informed that by reason of the closing of the Southern Shops the defendant had decided to go to Tifton " to the home of my father, T. B. King, where you can locate me at any time." The only reference to the fire is as follows: " I left my house Saturday night at 7:00 o'clock p. m. to go to town, and so far as I know there was no fire about the place except the oil-lamp, which light I extinguished as I was leaving. I called on Max Ingram of No. 62 Adamson Street, and we went immediately to a show, and I did not return home until 12:30 a. m. Sunday morning, and knew nothing of the fire until that time."

About the 3rd or 4th of May, Sharp, the State fire inspector, went to Tifton and inquired for King, but could not locate him, but as soon as King learned that Sharp was in town he went to him and was conducted by Sharp to the office of the judge of the superior court. The accused willingly accompanied the inspector, without the purpose of the visit to the room of the judge being communicated to him in advance. Present in this room were H. S. Murray, notary public, Charles Miller, J. J. Rooney, and Mr. McNichols, court stenographer, besides Sharp. The parties assembled in this room, according to the testimony of the inspector, about six o'clock in the afternoon, and remained until the completion of the enterprise, something after nine o'clock at night. After three hours of *grilling* (as the conversation is denominated by the State's witness) the accused, who at the time he went to the court-house and entered into the conversation, did not know that he was charged with any offense, or, so far as appears, that he was even suspected of burning his own house, made a plenary

confession of his guilt.  The testimony as to the confession and the circumstances which induced the accused to confess are detailed by the State's witness Sharp as follows:

"I got hold of Mr. King along about 6 o'clock, after looking for him all day long, and carried him to the hotel in Tifton, and after grilling him about three hours on this fire he confessed to setting it afire; that confession was freely and voluntarily made; it wasn't induced by any fear of punishment or by any reward or by any hope of reward held out to him; when he made that confession Mr. H. S. Murray, notary public of Tift county, Mr. Charles Miller, Mr. J. J. Rooney, and Mr. McNichols, court stenographer of Tift county, were present.  He told me that on Friday night before the fire on Saturday night he moved a dresser, washstand, mattress, some pillows, art-square, rugs, and a refrigerator to 127 Marietta Street.  When I came back to Atlanta I went down to 127 Marietta Street and found the articles that he told me he put there on Friday night before the fire occurred on Saturday.  I learned from one of the neighbors that some furniture had been stored at Cathcart's place after the fire. I went to Cathcart's place and checked up the furniture that he had stored there; the furniture that he had stored there was a dining-table, a dresser, some washstands, dish-pans, a few dishes, and some springs, and to the best of my recollection a couple of iron beds, old beds that they had down there.  In interviewing Mr. King we asked him how he started the fire; he stated that he had taken some papers and some waste that had come from the Southern shops, and saturated it in kerosene oil, put it in the closet about seven o'clock; he said that he taken a candle and set it on a piece of paper with a fuse to where the candle burned down it would set this paper and this waste afire.  We asked him about how he was going to set it afire and how he knew about it; he said, 'Well, I have tried the candle before;' he said, 'I timed it and it taken two and a half to burn up;' and he says, 'I set the candle at seven o'clock, and I figured that it would be two hours and a half when the fire occurred;' and the records show 9:36, I believe is the time the fire department was called to this place; and he also said in his statement that he moved his stuff to Cathcart's, which we checked up.  I went out to his father-in-law's home, interviewed his wife.  I examined the trunks which he had moved

from Atlanta to Tifton. I got the man who had hauled the trunks from Tifton station to the house, and he identified hauling the trunks. I examined the trunks, and some of the stuff he claimed in his proof of loss I found in the trunks; some of his army underwear that he claimed to have lost, that was in his trunk; we looked for his pistol that one of the witnesses told us that he tried to get on that night, and his wife told us that he had the pistol with him; what we were trying to do was check up on the things, wasn't caring much about the pistol; so he told us after we got hold of him that he did have the pistol but done carried it home before we saw him. Mr. King signed the name T. E. King to the two-page paper which you hold in your hand; the names of the five witnesses signed to it were signed in my presence by those witnesses, and they were present when Mr. King signed it; it was signed in the office of the superior-court judge at Tifton."

On cross-examination the witness testified: "I went to Tifton, interviewed some witnesses there, and saw Mr. King there; when I first saw Mr. King it was late in the afternoon about 6 o'clock. I don't know what street it was, but right opposite the ice plant I believe, in Tifton, he was talking to his father-in-law. I came down in a car. I didn't know Mr. King personally. I did know his father-in-law, because I had seen him that morning at his home. I looked around and said, 'I believe that is Mr. King.' I got out and walked back over there. Mr. King was talking to his father-in-law. I have forgotten his name. I said, 'Mr. King.' 'Yes.' I introduced myself, told him what I wanted; he said, 'I've been to the hotel, you were out,' and I said, 'I understood you had been in there; that's the reason I come back for you;' he went to the hotel with me, we went up to the room, and it was about 9 o'clock when he come across and told me about it. I started about 6 o'clock; it took may be three hours to get the confession out of him; the means I used of getting it was giving Mr. King the evidence that I had got in Atlanta. Mr. King denied it bitterly. I disremember just every word that transpired, but two or three things that transpired. I says, 'Mr. King your wife told me differently; now listen, don't sit there and perjure yourself; you are under oath.' He says, 'Well you may know differently, but its just that way.' I says, 'Well, your wife says that you had the gun with you.' I can't recall everything that trans-,

pired, but the gun was one of the articles mentioned, and so he says, 'Well, I did carry the gun out.' I believe he said that he traded the gun with somebody that day. I couldn't recall the whole conversation from 6 to 9, but I am just telling you things that I can remember in my mind that transpired. I says, ' If you know anything about the fire, it is best for you to come on and tell the truth and not try to lie out of it, because we have got the evidence to show what the stuff is and what is done.' I told him as a general rule of courts a man pleads guilty, don't put the courts. to trouble; they generally make it a little bit lighter, but I didn't have anything to do with that, that's up to the court. About two hours after that we just about quit talking; he just walked up, and I told him, ' The best thing now is to come on, tell the truth and come ahead, and let us know how this thing started;' he walked up then with tears in his eyes, and says, ' Gentlemen, this fire was a little bit crooked,' and that's the first word that he said; and I said, ' Come on now and tell us what way it was crooked and how it was.' Then he opened up and told us just like I have stated before; that was after talking with him about three hours; he was denying his guilt of part of it; some of it he would admit, about the pistol and things like that; stuff that he moved from there, some of it he would admit; the confession was made freely, he stated that his confession was made freely and in the presence of witnesses. As to why I had to work on him three hours to get it out of him, I suppose that a man can make a statement freely, but he can make you wait three hours before he makes it; working on him twelve hours doesn't necessarily mean that he was pushed into it — I certainly did tell him that if he knew. anything it would be best that he tell it and tell the truth about it. I got all of these witnesses to sign this thing because the law requires a witness you know, when a man states a thing like that "

This testimony was objected to upon the ground that the statements of the witness showed that the confession was not freely and voluntarily made by the accused; and this motion was overruled. At the conclusion of the testimony counsel for the accused renewed his objection and moved that this testimony be excluded and withdrawn from the jury, upon substantially the same grounds as that contained in the objection to the testimony at the time of its introduction. The court denied the motion and

refused to exclude the testimony. The jury returned a verdict finding the defendant guilty. The defendant made a motion for a new trial, which was overruled; and a writ of error was sued out to the Court of Appeals, which affirmed the judgment of the lower court, and the case is before this court upon certiorari.

*Thomas J. Lewis,* for plaintiff in error.

*John A. Boykin, solicitor-general,* and *E. A. Stephens,* contra.

RUSSELL, C. J. (After stating the foregoing facts.) The fact that the certiorari was granted in this case, or in any other instance or cause for that matter, does not necessarily mean that this court was of the opinion at the time of granting the certiorari that it would review or undertake to consider all of the assignments of error which had been presented to the Court of Appeals. As held by this court in *Central of Georgia Railway Co.* v. *Yesbik,* 146 *Ga.* 620 (91 S. E. 873), it was not the purpose of the amendment of 1916 to the constitution, whereby provision was made for the issuance of a writ of certiorari to the Court of Appeals, that such review was conferred upon all litigants as a matter of right. If this had been true, there would be but little reason for the existence of the Court of Appeals; for the losing party in practically every case, if dissatisfied with the judgment of the Court of Appeals, would demand and avail himself of the writ of certiorari, and this court would have to decide cases of which, under the constitution, the Court of Appeals has exclusive jurisdiction, as well as those in which jurisdiction has been reserved to the Supreme Court, just as this court did before the creation of the Court of Appeals. And with the increase in population and the consequent increase in litigation since 1896, when the number of judges of this court was doubled, the task would be an impossible one. Under the ruling in the *Yesbik* case, supra, the amendment to the constitution above referred to as to certiorari from the Court of Appeals to the Supreme Court has been construed by a unanimous bench, and our duty is confined to cases which present matters of gravity and importance. This court has not hitherto undertaken to define at length the scope of these two terms, nor the precise sense in which the words gravity and importance are to be understood and applied. As to the case at bar it is enough to say that the rule that incriminatory admissions and confessions must not be admitted if there is evidence, arising from

the testimony as to the confession itself, that the confession was induced by the *slightest hope of benefit,* or the remotest fear of injury, is so fundamental and *important* that this court in such an instance ought to grant the writ of certiorari and carefully investigate the complaint.

The grant of the writ of certiorari because this court may be of the opinion that a question of gravity or importance or a question of both gravity and importance is involved will not necessarily require the adjudication of other assignments of error presented to the Court of Appeals. For this reason we shall only pass upon the single question as to whether the trial judge erred in refusing to exclude the evidence offered by the testimony of the fire inspector, and consequently whether the Court of Appeals erred in affirming the judgment of the lower court in spite of the error — if it was error — in overruling the defendant's motion to withdraw from the jury the evidence of the fire inspector as to the confession. Section 1032 of the Penal Code declares: "To make a confession admissible, it must have been made voluntarily, without being induced by another, by the *slightest hope of benefit or remotest fear of injury."* Words can hardly be used tending more strongly to protect the right of one accused of crime of his personal right to be free from cruelty, artifice, or the machinations of prosecutors during his confinement and imprisonment before trial. I do not think it necessary to state any of the many decisions of this court, all of which have sought to maintain the rule of evidence embodied in the code section named, but each of which differs somewhat from the others in the sayings and doings of the parties and the surroundings of the defendant at the time of the alleged confession, from which the court was compelled to make a finding as to whether there was in each particular case either the slightest hope of benefit or the remotest fear of injury by another, and to determine from the various and different circumstances whether the trial judge erred in admitting the testimony in the particular case then under review. And in all of the adjudications this court seems to have applied in each case the requirements of section 1032, supra. We shall follow the beaten path, and take the code section as a yardstick and apply it to the circumstances in this case. The section begins: "To make a confession admissible." The use of this

language implies that all confessions are prima facie inadmissible. This is necessarily true in view of the preceding section (1031), in which it is declared that " Confessions of guilt should be received with great caution. A confession alone, uncorroborated by other evidence, will not *justify* a conviction." And the further fact, that running like a thread through the warp and woof of all our jurisprudence is the great Anglo-Saxon principle that no man is required to incriminate himself, which is embodied in America in our constitutions both State and National.

From our examination of the record we think our learned brother of the trial bench, whose ability and fairness can not be questioned, in the hurry of the trial overlooked the fact that upon the court *alone* rests the prerogative of admitting testimony, and that where proof of confessions is offered the court should not admit such proof unless his mind is satisfied that this testimony, like all other evidence, is admissible. Of course where a prima facie case of admissibility is made which satisfies the judge, he admits this testimony as any other testimony, to the jury, and they pass upon the *credibility* of the testimony in the event and after they too have determined whether the statement was freely and voluntarily made. However in every trial, while the jury pass upon the credibility of evidence if it is before them, the question whether certain testimony, or any particular evidence, shall be submitted to the jury to pass upon rests solely with the judge. As it appears from the record in this case, the judge, in overruling the motion to exclude, stated that he would leave the admissibility to the jury. Was the statement by the defendant made voluntarily without the slightest hope of benefit or the remotest fear of injury? The defendant, even if he be guilty, evidently thought himself secure from harm as the sole possessor of his secret — the only person that knew — about the arson. His letter to the fire inspector, that " I will be in Tifton any time that you want to communicate with me," no matter how guilty he may have been, evidences that he was not afraid of any disclosure which might affect his liberty. So imbued was he with the sense of security that when the inspector came to Tifton a month later, and he heard that the inspector had been trying to find him, he went at once and found the inspector. According to the testimony he did not demur to conversing with the inspector, or seek to delay the

interview. If in response to frank and direct questions from the inspector he had made the admissions at that time which were later wrung from him, reduced to writing and sworn to, it might be said that the statement was voluntary.

The Code ordains as a first general requirement, which is later given a more specific definition, that to make confessions admissible they must be made *voluntarily*. The last word was purposely used. Voluntary is practically synonymous with spontaneously, of his own free will; and not when overmastered by the will of another. It is derived from the Latin *volus*, which means one's own will. The reading of the testimony sought to be excluded, as it will be found in the statement of facts, and the picture of this young defendant taken by an officer, whose duties are statewide, to the room which the defendant, who lived in Tifton, knew was the room of the judge of the superior court, and surrounded by the court stenographer, and an attesting officer, as well as another person, none of whom perhaps he expected to meet when he accepted the invitation of the State fire inspector to talk the matter over with him, where after being grilled for three hours, and being subjected to such a nervous strain that he broke down and cried, and at length after he was told that he was telling a different story from that told by his wife, and frightened by the statement that he needn't lie because they had ample evidence to convict him, after being charged with guilt of a crime more heinous than arson — the crime of perjury, after having been sworn before his own examination, with no friend or counsel to advise him of his right and privilege to refuse to swear, he makes the confession which was admitted by the court. We cannot agree that the confession obtained under these circumstances can be said to be voluntary, for the witness establishing the confession testified that he reiterated and protested time and again that he knew nothing of the burning; and though he did not confess because he succumbed to tears or his awe of the situation and surroundings, it is testified that no confession came until the State's officer told him to come on and make a clean breast of it, because as a general rule courts were lighter on those who did not give them much trouble. It is true that the witness says that he told him in that connection that that was a matter for the judge, and that the witness himself could not promise him anything.

But is it not true that the defendant would naturally *believe* that if it was a general rule of the courts to be lighter on those who pleaded guilty and gave no trouble, he would come under that rule if he would confess? Would he not at least entertain such a *hope?* A man may not have enough faith to believe, and yet may hope. Hope by itself is not enough to make belief, but hope may exist even though there be no foundation sufficient to support belief. To say that this statement of the defendant was induced without the *slightest hope* of benefit would, it seems to me, at least substitute in the statute for these two words the word belief, and, contrary to the statute, would admit all confessions unless it was established that the statements made to one accused of crime were so strong as to induce a *belief* that he would be benefited, when the law at present does not require the inducement which will exclude a confession to be that strong.

We think, too, that in this case the confession was induced by a remotest fear of injury. Here was a statewide officer who was receiving the statement of the accused after he had been duly sworn, who charged him with lying and perjury, and was warning him against committing that offense. The defendant probably did not know the difference between perjury and false swearing; but as the inspector stated that he was already in possession of ample evidence to prove the statements that the defendant was making were false, he was therefore prepared, so far as the defendant knew, to convict him of false swearing, and the statement made as to defendant's lies, and the ability of the inspector to demonstrate the falsity of the defendant's statements, can very well be construed as an ominous threat which would tend to provoke not merely a remote fear of injury, but a very present fear of a conviction of a crime. We think that the testimony to which objection was made should have been excluded, irrespective of the guilt or innocence in this case; and aside from other assignments of error in the bill of exceptions, to which for reasons heretofore pointed out we shall not direct our attention, the question of the admissibility of confessions is one of gravity and importance; and the Court of Appeals erred in affirming the judgment of the lower court, and this cause must be remanded for decision upon the point here involved, in accordance with the views expressed in this opinion.

*Judgment reversed. All the Justices concur.*

Beck, P. J., and Atkinson and Hines, JJ., concur in the result as announced in the headnote.