### LEE v. THE STATE.

No. 6726. May 22, 1929.

*Herbert A. Strickland* and *Raymond Pierce,* for plaintiff in error.

*George M. Napier, attorney-general, W. B. Gibbs, solicitor-general, T. R. Gress, assistant attorney-general,* and *James R. Thomas & Son,* contra.

RUSSELL, C. J.   James Lee was indicted and tried for the murder of H. M. Acuff by wrecking the train of the Southern Railway, upon which Acuff was fireman, in which wreck the fireman was killed; the indictment further charging the defendant with the offense of train-wrecking and murder.   The defendant was convicted and sentenced to be electrocuted.   He moved for a new trial, and upon the overruling of his motion he brought the case to this court by bill of exceptions.

The first special ground of the motion for a new trial complains of the admission of the folowing evidence: "When we headed into the spur-track the engine and one car was derailed, and engine turned over.   When it turned over it was lying on the side with the fireman laying under it dead, and the engineer was pinned in his seat, couldn't get out.   There was steam escaping, and an outcry was being made by the engineer; he was hollering for help; we couldn't get him out without releasing him from the machinery."   Counsel for the defendant objected to the admission of this testimony, upon the ground that any evidence about the condition of the engineer was immaterial and irrelevant.   The court overruled the objection and admitted the testimony.   It is insisted that this ruling was erroneous, because the evidence was prejudicial and harmful to the movant, because it was not alleged in the indictment that the defendant was charged with the murder or injury of the engineer, and said testimony prejudiced the minds of the jurors against the defendant and deprived him of a fair and impartial trial.

Error is also assigned upon the admission in evidence of an alleged confession of the defendant, over the objection of his counsel that the statement or confession should not be read to the jury until counsel were given an opportunity to show that the confession was not freely and voluntarily made.   Movant urged before the court the following ground of objection: "And further than cross-

examining him, we would like to put other witnesses up, your honor, or either let the jury retire and prove that this was not freely and voluntarily made, and we would like to prove that before it is read in the presence of the jury." The court ruled: "Well, Mr. Strickland, of course I will charge the jury that unless they find that it was freely and voluntarily made without the slightest hope of reward or the remotest fear of injury, that it would be their duty not to consider it at all. You may cross-examine this witness if you wish, but I don't think it would be proper to go into the examination of other witnesses at this time." It is recited in this ground that counsel reserved their right to object to the admission of the confession after the testimony in behalf of the defendant was concluded. At the close of the introduction of evidence counsel for the defendant made the following motion: "Before we close we want to object to the confession introduced, and move to rule it out, on the ground there was hope of reward and there was fear of injury connected with it and which caused the defendant to make it, that the defendant while making this was laboring under fear and was expecting some reward from the confession, as has been brought out from the witness-stand. We now move the court to exclude the written confession introduced in evidence by the State." The court ruled: "Well, I'll let it stay in, and let the jury pass on whether it was freely and voluntarily made."

"Statement of James Lee in regard to the wrecking of passenger-train number eight, known as the Kansas City Special, on the night of March 18, at a place in Wayne County known as Ross' Siding near the turpentine still of Moody Brothers. About two years ago Jasper Williams, my brother-in-law, and myself were walking going from Ross' Siding to Brentwood, Georgia, and on our way we found a bunch of keys, containing a Southern Railway switch-key, which is now exhibited to me, and which I identify in the presence of J. O. Mattox, L. W. Rogers, H. W. Conoly, J. C. Clements, J. G. Clements, W. L. Eagle, R. P. Tindall, W. S. Conoly, E. H. Carmichael, R. S. Majette, as being the same key which Jasper Williams and myself found. Some little time after we found the key we began discussing unlocking the side-track switch at a place known as Ross' Siding. Prior to this discussion we had tried the switch-key and found that it would unlock the switch. We discussed the unlocking and turning of this switch

for the purpose of robbing the train, on a good many occasions. Finally, after figuring on the matter for some two years, on March 18th, 1928, we were drinking buck and discussing various subjects. Jasper Williams and his wife spent practically the entire day Sunday the 18th of March, 1928, at my house. About twelve o'clock Jasper Williams said to me, 'Let's go ahead and do what we have been figuring on,' and I said, 'Well we have been talking about it quite a while; if we are going to do it, let's go ahead and do it.' We talked about the matter all along during the afternoon, and about eleven or eleven thirty o'clock, just before we knew it was time for the midnight passenger-train to come along, we went down to Ross' Siding, and I unlocked the switch and we both threw the switch in a position for the train when it arrived at this point to leave the main line and go into the sidetrack. The switch light was not burning when we threw the switch. There was standing on the side-track one box-car, and Jasper Williams and myself had discussed that when the train went into the side-track it would strike the box-car and stop, and would not run off. We then discussed together and planned that after wrecking the train we would enter the mail-car and get the mail sacks in which we had figured and discussed between ourselves that contained money; we figured and discussed together also that we would rob the mail-car while the other folks were working on the engine part of the train trying to get it back in position to run. The train came and went into the side-track just as we had planned; but our plans did not work out as we thought, for the reason that the engine hit the box-car, tore it up, knocked it off the track, the engine turned over, the steam-pipes burst, such an awful racket was made, the screaming and crying from some place, we were afraid to continue our plans of robbery. I then said to Jasper Williams, 'Let's go,' and he said, 'I am not going; I am going to throw these keys away,' referring to the bunch of keys on which is contained the switch-key with which we unlocked the switch. I carried the officers to the place where Jasper Williams had thrown the keys, and there a member of the party searching for the keys found them. After the wreck I would not go down where it was, but waited until Isaiah Wright and a negro named Ed Jones came, and then me and Ed Jones and Isaiah Wright went down to the wreck. Jasper Williams would not go to the wreck. It was about two

hours after the wreck before Ed Jones, Isaiah Wright, and myself went down there, and I stayed around there until about sunup the next morning; a little while after sunup after I left, Jasper Williams came down there. Jasper Williams and I acted together in wrecking this train. This statement was made by me freely and voluntarily in the sheriff's office at Jesup, Georgia, in the presence of all the parties above named as having been present when I identified the switch-key, and is made without any threat from anybody, or fear of punishment and without reward or the hope thereof, and each and every statement above made is true. Signed: James Lee, in the presence of the undersigned as witnesses: J. O. Mattox, J. W. Conoly, J. G. Clements, W. J. Eagle, W. S. Conoly, L. W. Rogers, R. P. Kendall, E. H. Carmichael, R. S. Majette, J. A. Conoly."

This writ of error presents two important questions for our consideration. The first is one of procedure affecting the preliminary investigation as to the admissibility of a confession by the court as provided in our Code, and the other is the insistence of the plaintiff in error that the confession as admitted in the trial now under review should have been excluded from the evidence under a motion of his counsel at the conclusion of the testimony. For satisfactory reasons we shall consider the second question first, since it more materially affects the substantial interests of one accused of crime against whom alleged confessions are sought to be introduced. It appears uncontradicted in the evidence that the first incriminatory statement made by the accused was induced by his employer Moody, and that the written statement which was actually introduced over the defendant's objection was but a repetition of the original statement. A Southern Railway train had been derailed at Ross' Siding by reason of the fact that the switch had been unlocked, whereby the passenger-train ran upon the siding, collided with a box-car, and finally when it reached the end of the siding the engine and one car were derailed, the engine turning over and killing the fireman, who was the person alleged to have been murdered. The train was derailed Sunday night, and at an early hour on Monday morning efforts were initiated towards the discovery of the miscreant who had wrecked the train. The indictment is in two counts, the one charging murder and the other charging train-wrecking and murder. The evidence is clear from

several witnesses that the crime was committed by some one who had unlocked the switch. There was no injury to the lock, but by unlocking the switch the train had been diverted from the main track to the siding. Necessarily only one who possessed a key to the lock could have committed the crime. The defendant was a turpentine hand of Moody, and in the questioning of various employees of this turpentine still which was near Ross' Siding he was questioned as to his knowledge, if any, of the circumstances of the derailment. This was in the early morning. He professed absolute ignorance of knowledge of the cause of the wreck. On Tuesday morning his employer and an ex-sheriff returned to where he was boxing for turpentine; and although he still protested ignorance and innocence, he was arrested by the sheriff and taken into his automobile. He was carried to the scene of the wreck and questioned concerning his possession of a switch-key. A large crowd of citizens were still assembled near the switch and wreck. However, no questions asked him elicited any information or any admission in any sense incriminatory. As to this there is no dispute. Finally Moody, the turpentine operator by whom the defendant was employed, with the permission of the sheriff stepped off fifteen or twenty steps with the accused, when the following occurred: "I says: James, you had just as well come clean with this thing and tell the truth; I says, they have already got practically evidence enough to convict you; and I says, if you'll tell about this switch-key I'll be able may be to get you out for two or three hundred dollars; and he says: Well, Mr. Lawton, I'll tell you that the key is down across the road. . . I told him I thought may be we could get him out for two or three hundred dollars. I was just picking the negro, you know. . . After he told me about the key I went back to the car, and told the gentlemen I thought I had found where the key was, and we went down to the house where he said the key was throwed. We looked around there for a good little bit before we found it."

The sheriff, after a short stop at Odum, took the defendant to the court-house where the statement previously made was reduced to writing and read over to the accused who signed it in the presence of witnesses. While no witness testified that threats of lynching, which were made both before the accused was carried to Jesup and on the way to the sheriff's office, were heard by the

defendant, it is very plain from the testimony that if the witnesses could hear these threats the defendant, who was mingled in with them, in the absence of any proof as to deafness, could not have failed to hear them equally as well, even if he had not been the party most acutely interested in hearing what was said about lynching him. So the question arises on the motion to exclude this confession whether this statement of the defendant was so absolutely free from hope of favor and so unmixed with fear as is required by our law in the provisions of section 1032 of the Penal Code of 1910. We are of the opinion that the trial judge erred in not sustaining the motion to exclude the evidence as to this confession. That it was influenced by hope is undeniable. The crime was most dastardly and properly punishable with death. The accused never admitted any degree of culpability until he was told by his "boss-man" that if he would tell him all about it he could get him out for two or three hundred dollars. We all know that a large class of laborers upon the public works look up to their employers as practically omnipotent in matters in which they may wish to intervene in behalf of their servants, and where they have been long in the service they have every confidence in their interest and solicitude for the safety of their servants. So I can conceive of no greater inducement that could be offered to the accused in this case than the assurance of his employer that they already had practically enough proof to convict him, and that if he would tell the truth about it he would get him out for two or three hundred dollars, which of course implied that he would allow the defendant to work that out with him and would pay the fine. Up to this time the accused had never admitted anything. This is undisputed in all the testimony. The written statement, according to the witnesses, purports to be a correct repetition of the statement made near the scene of the crime. It is sworn to be the same in its contents. It was read over to the accused before he signed it, for the purpose of reproducing correctly what he had previously stated. We therefore do not have before us an instance where there are two statements and the latter may differ from the former in some details, upon which we have sometimes adjudicated. A careful review of the evidence as set forth in the record therefore makes absolutely certain that this confession was induced by hope of reward or benefit. But even if the written statement could be.

considered as an original proposition, then it clearly should have been excluded as having been induced by fear of injury, because the record shows that in the time intervening between the oral statement as reduced to writing in the court-house and the verification of the written statement by the signature of the defendant, he had been threatened with being filled with bullets from a 38-caliber pistol; he had had some teeth knocked out by a pistol in the hands of one of the witnesses, and it was the general consensus of opinion, expressed by some of the witnesses who did not attempt to say that the defendant did not hear them, that the accused should be promptly lynched. We are of the opinion, therefore, that the court erred in overruling the motion to exclude the confession from the consideration of the jury. *King* v. *State,* 155 *Ga.* 707, 713 (118 S. E. 368); Penal Code (1910), § 1032.

The assignment of error in the motion for a new trial complaining of the admission of evidence as to the condition of the engineer of the train after the wreck is expressly abandoned in the brief of counsel for the plaintiff in error, and therefore need not be considered.

*Judgment reversed. All the Justices concur, except Gilbert, J., absent.*