WHITE *v.* THE STATE.

No. 9189. MAY 18, 1933.

*M. G. Hicks, Leward Highlower,* and *Durwood T. Pye,* for plaintiff in error.

*Lawrence S. Camp*, attorney-general, *John A. Boykin*, solicitor-general, *T. R. Gress*, assistant attorney-general, *J. W. LeCraw*, and *E. A. Stephens*, contra.

ATKINSON, J. Mose White was jointly indicted with Richard Sims, John Peek, and Richard Morris for the murder of Frank C. (called Red) Foster, by shooting him with a pistol. Mose White was placed on separate trial. The homicide occurred at about eleven o'clock at night in a store located "at 565 Boulevard N. E.," in the City of Atlanta in Fulton County, Georgia. Foster was a policeman who had walked into the store and was leaning over a counter engaged in conversation with the proprietor. Four persons, including Mose White and his brother Harold (called Toodlums) White, armed with concealed pistols, came into the store ostensibly to make purchases, and took positions at different places. Harold White, the apparent leader, called "all right boys," and with two drawn pistols surprised the clerk and rifled the cash register. At the same time Mose White drew two pistols while the others placed their hands in their pockets. The clerk did not resist, but walked toward the rear of the store, with Harold holding a pistol against his back. When they reached Foster and the proprietor, who had not noticed what had happened, Harold commenced shooting Foster from his front and Mose commenced shooting at him from his rear. After being shot twice by Harold, Foster shot Harold, who being seized by the proprietor fell behind the counter, mortally wounded. It all occurred in a few moments, and Mose and the other offenders ran away, leaving the automobile in which they had come to the place parked in the street, with the engine idling. Foster received three wounds from the front, causing him to die in a few minutes. Harold White lived to be carried to a hospital. The three offenders who escaped soon met at a designated house which they had previously frequented, and from which they had left on the night in question, and divided the money taken from the cash register. Mose White later in the same night went to the home of his parents and informed them that Harold was in the hospital. He also went to the homes of other relatives, and made incriminatory statements. About two weeks later he was arrested in Detroit, Michigan. On his separate trial, there being evidence tending to show all that is stated above and other evidence which hereinafter sufficiently appears, Mose White .

was convicted, and was sentenced to be executed. His motion for a new trial was overruled, and he excepted.

■ In the first special ground of the motion for a new trial complaint is made of admission of testimony of John Redwine, relating to certain incriminatory statements made by Mose White to the witness and his wife at their home at about 12:30 o'clock on the night the crime was committed. The testimony was admitted over objection, and a motion to rule it out was overruled, the ground of objection being that the State had not laid the foundation for introduction of admissions in evidence by proof that they "were freely and voluntarily made, without the slightest hope of benefit or the remotest fear of injury; that the evidence theretofore given by Redwine, concerning the circumstances in which the admissions were made, showed that they were not freely and voluntarily made by the defendant, but were made by him while in tears to his sister as a confidential communication induced by her pressure and reminder of his brother's death and mother's imprisonment arising out of the transaction which was the subject of said alleged admissions." The preliminary testimony of the witness on direct and cross-examination was: "Mattie Redwine is my wife. . . I saw Mose White that night. He came to my house around 12:30. My wife handled two phone calls. The first one was about 15 minutes before the second one. It was about 15 minutes after the second call before Mose came to my house. It was all within about thirty minutes— the first and second call and his appearance at my house. When he got to my house he knocked on the door, and I went to the door and let him in, and he came in the bedroom. I did not have any conversation with him. I was listening to their conversation. My wife did not threaten him any; she kept after him to tell her what happened. Then he came on and told it, and that's all that happened. My wife is his sister." (Cross-examination) "There was just the three of us present; that was my wife, Mose, and myself. My wife and I were at home in bed when Mose came in. My wife spoke to him first. Mose ain't said a word when he came in. My wife said to him, 'Tell me what happened.' The best I remember, she said, 'What is the matter? They tell me Toodlums is dead; tell me what has happened,' and Mose did not say anything. It seems like, the best I can remember, he started to crying and shed a few tears, and then she kept questioning him, and he told her.

No, he was not crying when he first came in. When she told him that Toodlums was dead, he shed a few tears. Then she pressed him and asked him to tell her the truth about it, and she called attention to the fact that she was his sister and told him about his brother being dead. She never mentioned the fact that she was his sister, and she never called his attention to the fact that Toodlums was his brother. The only thing was that she said Toodlums is dead. As to why I said awhile ago that she called attention to the fact that she was his sister—that's what you said. I reckon there was about three minutes time transpired from the time Mose began to tell her about the affair and the time when she first began to talk to him. He was reluctant to tell her at first. After she began to press him he told her. When attention was called to Toodlums' death he cried a little. . . The only thing that was said about her mother was that she was in jail, locked up in connection with this affair. . . When my wife pressed him and told him about his mother being in jail and his brother dead, he told it."

It is declared in the Penal Code, § 1032 : "To make a confession admissible, it must have been made voluntarily, without being induced by another, by the slightest hope of benefit or remotest fear of injury." Immediately following it is declared (§ 1033) : "The fact that a confession is made under a spiritual exhortation, or a promise of secrecy, or a promise of collateral benefit, shall not exclude it." The preliminary evidence was sufficient to lay the foundation for admission of the testimony as to incriminatory statements. The fact that in the circumstances related the statements made by the defendant were in response to an appeal made by his sister, in which she alluded to the death of his brother and incarceration of his mother, would not render the statements inadmissible. The appeal was not stronger than "spiritual exhortations," which the Code declares shall not exclude a confession. No hope was held out to him by his sister. If he was impelled by any hope, it was out of his own imagination, and would not have affected admissibility of the evidence. *Hill* v. *State,* 148 *Ga.* 521 (97 S. E. 442). See also *Barker* v. *State,* 169 *Ga.* 414(2) (150 S. E. 642) ; *Bradberry* v. *State,* 170 *Ga.* 859(4) (154 S. E. 344) ; *Bradberry* v. *State,* 170 *Ga.* 870(3) (154 S. E. 351). The foregoing is in accord with *King* v. *State,* 155 *Ga.* 707 (118 S. E. 368), followed in *Lee* v. *State,* 168 *Ga.* 554 (148 S. E. 400), in which, on different

facts from those in the instant case, the alleged confessions were held inadmissible.

■ The third special ground of the motion is as follows: "Because the court erred in admitting in evidence, over objection of defendant as hereinafter stated, the following written statement allegedly signed by defendant Richard Sims and Richard Morris, said statement to which objection was made being in words and figures, as follows, to wit:

'State v. John Wesley Peek, Arthur Thomas White, alias Mose White, Richard Morris, Richard Sims.

'Murder of Detective Frank C. Foster with Pistol, March 16, 1932.

'Joint statement of Richard Morris, Richard Sims, and Arthur Thomas White, alias Mose White. About seven o'clock Wednesday night, March 16th, 1932, we together with Harold White left the house in the rear of 34 Rawson Street, and went out Rawson to Capitol Avenue and out Capitol Avenue to Bass Street, and out Bass Street to Washington Terrace, and there we got the Ford coupé that we were using on the night of March 16th. The car was parked by the side entrance to 735 Washington Street. We went Washington Terrace to Pulliam Street and Pulliam Street to Richardson Street, and out Richardson Street to Martin Street, and then we just rode around in Summerhill until about ten-thirty. Harold White was driving the car. When we left Summerhill we came up Capitol Avenue to Piedmont Avenue and out Piedmont to Forrest Avenue and Forrest Avenue to Boulevard and out Boulevard Place and turned right off Boulevard onto Boulevard Place and parked the car near the back of the store where the shooting took place. Harold White went into the store and bought some potato chips, and came back out and said there were three men in there, but that was all right. Mose White went in first and went just back of the heater near the back of the store, Harold White went in next and asked the man for a lady lock, and when the man reached for it Harold put the gun on him and told him to stick them up. Richard Sims walked in behind Harold and followed him behind the counter. Richard Morris got just inside the store and was near the place where you go behind the counter. Just as Richard Sims rang the register, the man that Harold had the gun on ran down behind the counter to where another man was leaning on the counter talk-

ing to the man that was shot, and hollered "Red, Red." Then the shooting started, and we three ran out of the store, and Richard Sims left his cap on the counter near the cash register, and Richard Morris lost his near the door. About twelve thirty we three met near the corner of Woodward Avenue and Frazier Streets and went to the house at the rear of 34-1/2 Rawson, and divided the money, which was five dollars and some change each. Mose White left the house then, and Richard Sims and Richard Morris went to bed, and we did not see each other from then until we were all in the police station. The above-named streets, locations, and routes are the ones that we pointed to the officers this morning.'

Signed by Thomas White, Richard Morris, and Richard Sims.

'Sworn and subscribed to before me this 24th day of March, 1932.

'H. L. Perryman, Notary Public, State at Large.'"

"To the introduction of the foregoing written statement in evidence defendant through his counsel objected at and before the time of the admission of the same, upon the ground that the same purported to be not only a statement of the defendant but also a statement of two other joint defendants, which fact rendered said statement inadmissible, for the reason that declarations of a joint conspirator, made after the enterprise has ended, are admissible only against the party making the same; and upon the further ground that the evidence theretofore introduced in connection with the circumstances of the alleged making of said statement showed that the same was one of a series of statements of the defendant, verbal and written, made under circumstances making all of the same one whole, and that it was incompetent and illegal for the State to introduce the statement sought to be introduced without introducing into evidence all the statements or admissions made by defendant, defendant through his counsel then and there contending that such procedure would be admitting in evidence a part of an admission of defendant without introducing the whole thereof. The evidence theretofore introduced, which movant contends showed that said statement was one of a series of statements constituting one whole, which rendered the said statement inadmissible because a part of an admission can not be introduced in evidence against a defendant without introducing the whole thereof, is as follows, to wit:

"The State's witness, S. A. Smith, was testifying in the case, and had given evidence concerning the apprehension of defendant and

his subsequent return to Atlanta, and had told of conversations which he had had with this defendant, and he testified: 'After having talked with him [defendant] on the way down, we got a statement from him in writing. During the taking of that statement Mr. Perryman and myself were present all the while, and possibly some one else was in and out. Mr. Perryman acted as the stenographer. He used the typewriter himself. He [defendant] was in our custody, all told, about thirty-six hours on the way down, at the time he gave us the [first] written statement. I have talked to him at different times. I don't know whether Mr. Perryman brought that statement to Mr. Boykin or not. Mr. Boykin did see it at that time. I know that. Mr. Perryman is an officer in the solicitor's office. The next morning we got from these boys another statement. Yes, we found it necessary to get another statement after getting the one the night before, and we got one after that, a verbal statement. This [referring to statement admitted in evidence] is the joint statement of the three together. As to why we thought it necessary to get another statement, I did not think the statement of the other three separately was the truth, and after we talked to them they said it was not the truth, and the reason that I got another statement was that I saw that the statement did not contain all the truth. So far as Mr. Boykin is concerned, if he ever saw any of the statements until the case was about complete, I don't know it. I don't know what Mr. Perryman did with it. He had the file with him around 11:30 when I left him, and he was back in the office around eight the next morning. He had the file when he left and when he came back. Of course, I don't know what he did with it. Mr. Perryman and I never decided that the first statement was not sufficient. We have always known that as far as it went it was the truth. It did not have all the truth in it. What we wanted was facts and truth. The reason that I wanted to get another statement was that I learned there were other facts that had not been told. Yes, I got a statement under oath, but I did not decide it was not the truth, but I knew that it was not all the truth. None of them hardly ever tell the truth all, all of it to start with. All I wanted was the facts out of them, if I could get it. Mr. Perryman and I were present when this second affidavit [the statement introduced and admitted into evidence and which is complained of in this ground] was made. As to whether Mr. Perryman and myself were

the two officers who procured all the affidavits, he and I were together each time an affidavit was taken from this boy [defendant]. Mr. Perryman witnessed this joint statement [the statement complained of]. He wrote it himself. He drafted the paper and witnessed it as a notary public. I saw these boys sign this paper. None but Mr. Perryman and myself saw them sign it. I did not say that three sworn affidavits were all that we got. I did not say how many we got. There were only two sworn affidavits gotten from this particular one [defendant]. One of them was the joint statement [the statement the admission of which is complained of in this ground].'

"The foregoing testimony of the witness Smith was the only evidence in the case concerning the several written statements made by defendant. Only one of these statements was offered in evidence; that is, the statement the admission of which is complained of in this ground. Said objection to the admission of the aforestated statement the court overruled, and allowed said statement into evidence to go before the jury. Movant assigns the action of the court in overruling the aforesaid objection to the admission of said statement, and in permitting the same to go before the jury as evidence, as error as being contrary to law, and says that said objection should have been sustained and said statement not admitted into evidence, for each and all of the reasons of objection aforestated and urged when and at the time said statement was offered, and because said statement purported to be not only a statement of defendant but also a statement or admission of two other joint defendants, made after the crime for which defendant was on trial had been fully completed and the alleged criminal enterprise ended, which fact rendered said statement inadmissible, for the reason that declarations of a joint conspirator made after the enterprise has ended are admissible only against the party making the same; and because the evidence of the witness Smith introduced in the case before the introduction of said statement, which evidence of said witness is hereinbefore set out in this ground, showed that defendant had made two written statements in the nature of admissions concerning the crime for which he was on trial, under circumstances making said two written statements one admission of defendant, which fact made said statement inadmissible in evidence unless accompanied by the other, because a part of an admission may not lawfully be given in

evidence against a defendant without introducing the whole thereof; and movant says that said statement was highly prejudicial, and that because of its illegal admission he ought be granted a new trial."

This ground of the motion for a new trial is without merit. On one feature, this evidence was dealt with in the case of *Morris* v. *State,* ante, 106. That case related to the same homicide, and involved admission of the same evidence as to confession.

■ The second special ground complains of admission of testimony of D. H. Mayo, to the effect that a pistol exhibited to him was his property; that one week prior to the homicide he was "held up and robbed" by Harold White and Richard Sims, who took the pistol from him. This evidence was admitted over the objection "that the same was irrelevant and immaterial, prejudicial, and calculated to inflame the minds of the jury against defendant; that it sought to inject into evidence the commission of a separate and distinct offense other than the one for which defendant was on trial, and an offense committed by persons other than defendant, and with which defendant had no connection and for which he is no wise responsible or liable, there being no evidence of a conspiracy between defendant and the alleged actors in this crime to commit the same; and if there were, said evidence of the same would nevertheless be irrelevant, not being a part of the res gestæ, nor illustrative of motive, intent or design." There was other evidence tending to show that the pistol was the one which Harold White used in committing the robbery directly in question and with which he shot the policeman, and that Mose White participated in the robbery by drawing his pistol and by shooting at the policeman at the time the policeman was killed by Harold White.

The fourth ground complains of the admission in evidence of testimony of LeRoy Spence, who testified that he and Richard Morris rented and occupied the house at 34-1/2 Rawson Street; that a black bag was kept in Morris's room, which belonged to witness's mother; that one night witness lent this bag to "Toodlums" (Harold White), who said he was going to get some whisky, and who brought the bag back in about two hours. At this time the solicitor-general asked, "How many times have you ever seen . . pistols in that grip?" to which the witness answered, "I have seen them in there twice." The testimony was admitted over objection

that it was irrelevant and injected a crime committed by a person other than defendant.

The fifth ground complains of the court's refusal to rule out certain testimony of LeRoy Spence. The witness testified, in effect, that on Monday or Tuesday morning preceding the Wednesday night when the homicide was committed, Mose White, Harold White, Richard Sims, and Richard Morris were at witness's home, and Harold White asked if he might leave three pistols at the house. Permission having been granted, he placed the pistols inside a chifforobe. About two hours later the three persons last named returned and took the pistols away, and did not bring them back. Mose White was not present when the pistols were left or when they were taken away. After delivery of the testimony the defendant moved to exclude the part of it "relating to the bringing to and leaving of weapons at the house of the witness Spence by Harold (Toodlums) White, and the returning thereto of Harold and other persons other than defendant to secure weapons, upon the ground that the same was irrelevant, immaterial, and shed no light on the issue involved in the case; that said testimony related to the acts and doings of persons not shown to have conspired with defendant to commit the crime for which he was on trial; that if a conspiracy were shown, said acts and doings of persons other than defendant took place before the formation of the conspiracy, and were not in furtherance of the same, and were declarations only of such persons; that the witness swore that defendant was at the house in question only once prior to the death of Foster, never brought any gun there and never came for one, and was never present when any guns were exhibited or talked about."

The second, fourth, and fifth grounds are considered together, because they are controlled by the same principle. The evidence which the judge admitted and refused to exclude tended to establish a general conspiracy to rob and murder, in the course of which the homicide in question was committed in the progress of the robbery in which the defendant was present and a participant, though he did not himself inflict the mortal wound. A conspiracy may be shown by circumstantial evidence as well as by direct evidence. *McLeroy* v. *State*, 125 *Ga.* 240 (2) (54 S. E. 125). The nature of a general conspiracy to rob and murder is such that in some instances resort must be had to circumstantial evidence to establish it,

For such purpose proof of other crimes is not inadmissible on the trial of one for a particular crime, where such proof tends to establish the general conspiracy, and thus to connect the defendant with the particular crime. *Horton* v. *State,* 66 *Ga.* 690; 3 Am. D. 83; *Morris* v. *State,* supra, and cit.; Spies *v.* People, 122 Ill. 1 (12 N. E. 865, 17 N. E. 898, 3 Am. St. R. 320).

■ The sixth ground complains of the admission in evidence, over objection that it was irrelevant, of a certain black bag or "grip." This was admitted in connection with other evidence tending to show that it was kept in the house at Rawson Street by one of the alleged conspirators, and that in it pistols were kept (including the pistols used in committing the robbery), and that the defendant on trial had at least on one occasion been seen to take a pistol out of the bag. There was no error in admitting this evidence.

■ The seventh, eighth, ninth, and tenth grounds complain of a refusal to declare a mistrial on account of the following words used by the solicitor-general in his concluding argument to the jury: "Will you permit an officer in the discharge of his duty to go out and be ruthlessly slain, and his widow come and ask for justice, his widow and child come in tears and ask for justice . . ? Do you think you can stop highway robbery and murder, such as this case, by going out and writing this kind of a verdict: We, the jury, find the defendant guilty, and recommend mercy? . . The jury has it in their power to recommend imprisonment for life. Now what does that mean? It means that after three years this defendant has a right to ask for a parole by going over with a sob sister from the interracial commission!" The judge instructed the jury not to consider the language of which complaint was made. In the circumstances the refusal to declare a mistrial is not cause for a reversal.

■ The eleventh ground assigns error on the charge to the jury: "I am going to give you in a moment a rather full charge on the question of conspiracy, and in that charge on conspiracy I am going to tell you that the acts and statements of conspirators or those who participate in the execution of a conspiracy, made during the time of the conspiracy, are admissible against all those who participate in the conspiracy, but statements and acts made prior to the time of the conspiracy or after it has ended are only admissible as against the one party who may have made such statements or who may have

done such acts." This was assigned as error, because it "instructed the jury that any acts and statements of conspirators made during the time of the conspiracy are admissible against all the conspirators, which is an incorrect statement of the law, in that said acts and statements, in order to be binding upon a conspirator not doing or making the same, must be done or said, not only during the time of the conspiracy, but also in furtherance of the conspiracy and pursuant to its plan and purpose, said charge instructing the jury that defendant would be liable for any and all statements and acts of his alleged conspirators whether or not the same were made or done pursuant to the conspiracy." After giving this instruction, the judge in connection therewith charged: "A conspiracy is a combination, plan, scheme, or agreement between two or more persons to do an unlawful act. The existence of a conspiracy may be established by proof of acts and conduct and by circumstances as well as by proof of an express agreement. When and if a conspiracy has been established to your satisfaction beyond a reasonable doubt, the acts and declarations of one of the conspirators are the acts of all, and each is responsible for the acts of the other, in so far as such acts are necessarily or naturally done pursuant to or in furtherance of the conspiracy." When the instruction on which error is assigned is considered with its context, it was not erroneous for any reason assigned.

■ The ruling announced in the seventh headnote does not require elaboration.

*Judgment affirmed. All the Justices concur, except*

RUSSELL, C. J., dissenting. After careful examination and deliberate consideration of the record and the assignments of error which are certified to be true by the presiding judge, I can not concur in the judgment of affirmance. Full expression of my views can serve no useful purpose. I gravely doubt the ruling in the second headnote, because the facts of the case at bar are not identical with those in *Morris* v. *State,* to which reference is made in the opinion. I dissent from the rulings stated in the third, fourth, and fifth divisions of the decision by the majority. I am of the opinion that the plaintiff in error is entitled to a trial free from the errors there dealt with, even though the evidence be sufficient to have authorized the finding of the jury.