BRADBERRY *v.* THE STATE.

No. 7775.   JULY 21, 1930.

*Carlisle Cobb, F. A. Gillen,* and *R. M. Nicholson,* for plaintiff in error.

*George M. Napier, attorney-general, Henry H. West, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

HILL, J. The grand jury of Oconee County returned a bill of indictment against Raymond Cooper, Weyman Bradberry, and Harvey Bradberry, jointly charging them with the murder of Dock Elder. Weyman Bradberry was put on trial, and the jury returned a verdict of guilty, without recommendation, and the court sentenced the defendant to be put to death by electrocution. The defendant made a motion for new trial, which was overruled, and he excepted.

■ The verdict was authorized by the evidence. The evidence for the State tended to show that the three young white men, indicted here, including the plaintiff in error, met and conspired to put to death the deceased, Dock Elder, an old negro, for the purpose of obtaining the money that he carried. They went to the home of Elder about midnight on November 10, 1929, and called him on the pretense that their automobile was broken down and they wanted him to assist them in repairing it. He took his lantern and went with the three men down the road toward where the automobile was said to be. Elder and Raymond Cooper were in front, and Harvey and Weyman Bradberry were in the rear. When they had reached a point several hundred yards from the house, near a bridge, on a signal given by one of the defendants, who said, "Hard-knot, aint you going to do it?" Harvey Bradberry hit Elder in the head with a chop-ax, and Weyman Bradberry jumped on him and cut his throat. Then they searched him, got two pocket-books from his person, and went back to the house. Thinking that the wife of the deceased, Frances Elder, knew who they were, they decided to "shut her mouth." Cooper stood in the door, and Harvey went into the house and killed the woman, and then came out and got in the car, and they left. Weyman Bradberry was sitting in the car at that time. The sheriff and his deputies found, hidden in or near the yard of the defendant's father, the pocket-books taken from the body of the deceased, containing $190, and more money was found behind the cotton house. The State intro-

duced A. Y. Crowley, the sheriff of Oconee County, who testified in part as follows: "I had occasion to talk to this defendant, Weyman Bradberry, about this crime. He made statements to me about it, freely and voluntarily, although no hope of reward was offered by me or any one else. I arrested Weyman Bradberry out at Mr. Cooper's, just beyond my house, and picked him up. He was sitting there in the car with his father. Mr. Carl Parson and Mr. Saye were with me when I arrested him, and we carried him down to Doc Elder's home, and drove up in front of the house, and I asked him if he would tell me where the hatchet was they killed Doc Elder with, and he said he didn't know anything about it. I left him sitting in the car with Mr. Parson, and I got out and looked for it, and Mr. Parson and Weyman talked a little while, and I came back to the car. It was raining. When I got back to the car Weyman says, if you will take the handcuffs off of me I will find the hatchet for you. I told him I thought we had enough evidence, and I didn't take the handcuffs off of him, and that if he wouldn't show me it was all right with me. At that time he stepped out of the car. I was looking for it on one side of the house, and it was on the other. He pointed it out to us, and Mr. Saye picked up the hatchet out of an open place, and he says, 'Yonder it is out yonder,' and Mr. Saye picked it up and brought it back, and Weyman says 'Let me put my hand on that,' and he took it in his hand and says, 'I want to say this is the first time I ever had my hands on this hatchet.' He identified the hatchet. He said it was the hatchet they knocked him in the head with. He said Harvey knocked him in the head, and he, Weyman, cut his throat. Then Harvey searched him and got his pocket-book and he and Harvey rolled him off down the bank. Weyman didn't know that they got but one pocket-book, somewhere around $25 or $30 in it, and they got two; and I don't think he knew even when they locked up the other two boys, possibly a week or two afterwards. There was a little splotch of blood on the hatchet when I found it. It is on there now. I said blood. It looked like blood when I got it. It is right there [showing]. They were traveling in an automobile. The automobile belonged to Mr. Cooper. When I got down there I walked around and looked at those car tracks, and I found out in a little while that the car was there, and came back this way, and we were looking back in this direction. In looking

at the car tracks I noticed the left-hind wheel; they were larger tires. It was a Hudson car. Left-hand wheel did not have as much air as the other, and made a little different impression on the ground. On Monday about 10 o'clock we found a car over at John Bradberry's, in Clarke County, that had tires that corresponded with that. I looked at the car. I was satisfied in my mind that was the car. I just looked it over and went back to Athens, and me and another fellow called up over there, and three or four fellows came over there, and we went down there and rolled the car out from under the shelter, and they tracked the car like I did. I wanted to see what they thought about it. When we rolled the car out we found some blood on the left-hand hind wheel. The left-hand hind wheel did not have as much air as the right. It was a Hudson car. It was Cooper's car. I got this knife you handed me off Weyman Bradberry. He is the defendant in this case. He told me this was the knife he used on Doc Elder. I got $190 of the money, I think. I found it at John Bradberry's in Clarke County. I found that bottle right there. I found the money in that bottle, just like it is now, under the front gatepost at John Bradberry's. I found it in the post-hole in the front yard. I found more money around behind the cotton house, or possibly crib. John Bradberry is the father of this defendant. That one-hundred-dollar bill is of the old bills. I have got the other money in my pocket. There it is. That is the denominations and everything that I found. I didn't pay much attention to the blows on Doc Elder's head. That blow could have killed a man, though. The knife wounds could have killed a man, too. His throat was cut plumb around. The knife I have here is a weapon that you could produce death with. It is a good big knife. I say the blade is four inches long. It is a wide blade. That hatchet is a weapon that could produce death." There was much other evidence corroborative of the foregoing; and from reading the entire evidence we reach the conclusion that the jury were fully authorized to find the defendant guilty of the crime charged against him.

■ Complaint is made in ground 1 of the amendment to the motion for new trial that the court erred in admitting in evidence the testimony of Hubert Crane, a negro boy, and a witness for the State, as follows: "I got up the next morning and saw the blood by the daylight and struck a match and looked, and she was right

bloody and had a hole knocked in her head, and a puddle of blood here in her room. I didn't call her. I lighted the lamp and told Alford I believe Aunt Frances was dead, and I told him again, and went up to my cousin's and told him." Counsel for the accused said: "We object to going into the question of Aunt Frances. It does not throw any light on the question of whether or not this defendant on trial murdered Doc Elder." The objection was overruled, and error is assigned on this ruling. Ground 2 is similar to ground 1; and error is assigned upon the admission of certain testimony of W. S. Elder, a witness for the State, as to Frances Elder, upon the ground that it threw no light upon the guilt or innocence of Weyman Bradberry of the murder of Doc Elder. The testimony was as follows: "The negro boy came up there and told the negro man above my house, and he came back and woke me up, and I went with him down there, and when we got down there the front door was fastened, and I told the negro boy to go around the house and open the door, and he did, and we went into the front door, and when I went in there Frances was lying on the bed and had been knocked in the head. She had a cloth, cotton towel, lying on her head, and it covered one eye partially and a little above the other, and had two indentations in the cloth about an inch and a half in diameter, and maybe three and a half inches apart and an inch and a half deep. I asked the negro man to raise the cloth, and those indentations corresponded with the holes in her skull." Movant insists that the foregoing testimony was irrelevant and harmful, and that it would only prejudice the minds of the jury against the defendant, and throw no light upon the killing of Doc Elder. We think the evidence was relevant and proper. Doc Elder had been killed by the accused and the other conspirators, and according to the evidence his wife was then murdered to "shut her mouth." It was a part of the same transaction. While the woman was being murdered the defendant sat in the automobile at the front of the house, with the motor running, while the other conspirators went into the house and put her to death. In these circumstances we think that evidence of another and distinct crime is admissible if it was committed as a part of the same transaction and formed a part of the res gestæ. See 12 Cyc. 407. In 3 Bishop's Crim. Proc. (2d ed.), § 629 (4), it is said: "Any motive rendering the killing probable or explaining it against

inherent improbabilities, or otherwise helpful to the jury, may be proved against the defendant." And see *Frank* v. *State,* 141 *Ga.* 243 (2 *b*) (80 S. E. 1016); *Williams* v. *State,* 152 *Ga.* 498, 503 (110 S. E. 286). In *Merritt* v. *State,* 168 *Ga.* 753 (149 S. E. 46), Mr. Justice Gilbert said: "In several grounds of the motion for new trial error is assigned on the admission of evidence as to 'separate and distinct crimes, and to the charge of the court concerning said testimony.' The general rule is, that, on a prosecution for a particular crime, evidence which in any manner shows, or tends to show, that the accused has committed another crime wholly independent from that for which he is on trial, even though it be a crime of the same sort, is irrelevant and inadmissible; but to this rule there are several exceptions. Among them is the admissibility of evidence showing, or tending to show, the commission of crime other than that for which the accused is on trial, for the purpose of showing motive, plan, or scheme." And see *Rawlins* v. *State,* 163 *Ga.* 406 (136 S. E. 448). We think the evidence here objected to was admissible to show the *plan,* not only to kill Doc Elder, but to "shut the mouth" of his wife, who, according to the evidence, had probably recognized the defendants when they came into the house, and there was a motive to get Frances Elder out of the way, in order that she could not testify against the defendants.

■ Grounds 3 and 4 of the motion for new trial will be considered together, as they relate to the same subject. It is contended that the evidence admitted as to the condition of the body of Frances Elder was erroneous and harmful to the defendant, for the reason that it threw no light upon the killing of Doc Elder, and that it caused a violent prejudice in the minds of the jury against the defendant; that even if the jury had been authorized to convict the defendant of the murder of Doc Elder, they could not and would not give due consideration to the sentence they should impose on the defendant, that is, whether they should recommend a life sentence or not. As pointed out in the preceding division, the evidence was material and admissible, and the assignment of error on its admission is without merit.

■ Ground 5 assigns error on the admission of the testimony of the sheriff, Crowley, as to certain confessions made by the accused after the sheriff had arrested him and put him in the sheriff's

car wherein were Mr. Carl Parson and Mr. Saye, and carried the accused handcuffed to the home of Doc Elder. The testimony was as follows: "And he pointed it [the hatchet] out to us and says, 'Yonder it is out yonder,' and 'Let me put my hand on that,' and he put it in his hand, and says 'This is the first time I ever had my hand on this hatchet,' and he identified it. He said, 'That is the hatchet they knocked Doc in the head with.' He said Harvey knocked him in the head, and he cut his throat, then Harvey searched him and got his pocket-book, and he and Harvey rolled him off the bank. Weyman didn't know they got but one pocket-book, somewhere $25 or $30 in it. And they got two, and I don't think he knew even when they locked up the other two boys, possibly a week or two afterwards. And he told me this was the knife he used on Doc Elder." It is insisted that the court erred in admitting this evidence, because the circumstances under which it was "extracted" from the defendant showed that the defendant was handcuffed and put in the car with three men, the sheriff and two others, neither of whom was an officer, and was quizzed by all three when taken to the home of Doc Elder, in what amounted to a threatening manner, the defendant being an ignorant youth and not knowing what these three men intended to do to him, they having put him forcibly in the car and taken him to the scene of a horrible crime with handcuffs on him; and that such circumstances could only be calculated to extort a statement or confession from defendant. It will be recalled from the evidence, a part of which is quoted in the first division of this opinion, that the sheriff stated that these statements made by the accused were freely and voluntarily made; and the bare fact that the accused was in the custody of the officers at the time he made the confession would not make it inadmissible for any reason assigned. The fact that one is arrested and accused of crime does not prevent the evidence as to a confession from going to the jury. *Smith* v. *State,* 139 *Ga.* 230 (76 S. E. 1016); *Price* v. *State,* 114 *Ga.* 855 (40 S. E. 1015); *Holsenbake* v. *State,* 45 *Ga.* 43; *Wilburn* v. *State,* 141 *Ga.* 510 (81 S. E. 444); *Hilburn* v. *State,* 121 *Ga.* 344 (49 S. E. 318); *Green* v. *State,* 124 *Ga.* 343 (52 S. E. 431). Where a preliminary examination of witnesses offered by the State shows that a confession was freely and voluntarily made without being induced by another by the slightest hope of benefit or the remotest fear of injury, such

evidence should be admitted for the jury's consideration. In the instant case the confession was shown to be freely and voluntarily made. The accused did not deny making the confession, nor contend that any hope of benefit had been offered him, nor contend that it was made under any threat or fear of injury; and it has been uniformly held that where such confession is shown to have been freely and voluntarily made, the burden is then on the defendant to show that the same was not so made. *Eberhart* v. *State,* 47 *Ga.* 598; *Hinson* v. *State,* 152 *Ga.* 243 (109 S. E. 661); *Cantrell* v. *State,* 141 *Ga.* 98 (80 S. E. 649). In the *Cantrell* case it was ruled: "Testimony as to alleged confessions being prima facie admissible, the court did not err in leaving it to the jury to determine whether or not such confessions were freely and voluntarily made," citing *Irby* v. *State,* 95 *Ga.* 467 (20 S. E. 218); *Adams* v. *State,* 129 *Ga.* 248, 251 (58 S. E. 822, 17 L. R. A. (N. S.) 468, 12 Ann. Cas. 158); *Lindsay* v. *State,* 138 *Ga.* 818 (76 S. E. 369).

■ Grounds 6 and 7 involve the same question, and they will be considered together. Movant complains that a mistrial should have been granted, because, as he contends, the solicitor-general in opening the case declared that he expected to connect the killing of Frances Elder with the defendant, Weyman Bradberry. A careful reading of the brief of evidence shows that the accused was one of the principals in the killing of Frances Elder, and that after Doc Elder was killed the conspirators, including the accused, decided that they must kill Frances Elder in order to "shut her mouth;" that Harvey Bradberry, one of the joint conspirators, actually struck the blow, and took the same knife with which the accused had killed Doc Elder, and the same hatchet which had struck Doc Elder and went into the house and killed Frances Elder. It appears from the testimony of A. Y. Crowley that when he searched Weyman Bradberry, he got the same knife from his pocket. According to the testimony of R. A. Saye, the accused admitted that he and those jointly indicted with him discussed killing Frances Elder, that Harvey Bradberry went in the house, and that the accused sat in the car in front of the house, and was ready to go. The sheriff testified as follows: "One of them made a statement that after Doc Elder was killed [one] said 'We have got to go up there and shut Frances's mouth' and I think it was

Cooper who said it. All three of them were present. Weyman told me that Harvey went in the house, and Cooper was standing in the door and he was sitting under the wheel, ready to go." From the foregoing it will be seen that the accused was connected with the killing of Frances Elder, and that there was a conspiracy between the three parties to kill her. These grounds are without merit.

■ Ground 8 complains that Dewitt Daniel, one of the jurors who rendered the verdict complained of, was disqualified for the reason that he was prejudiced and biased in advance of the trial. There were affidavits of two or three witnesses who claimed that Daniel, prior to his being drawn as a juror in this case, said: "I haven't a damn bit of sympathy for them [meaning Weyman and Harvey Bradberry and Raymond Cooper]. They should be taken to the bridge where they killed Doc Elder, and their damned throats cut and thrown off the same bridge they threw him off," and other similar statements. The juror, on the hearing of the motion for new trial, denied having made the statements attributed to him; and there were a number of affidavits in which the affiants deposed that the juror, Daniel, was a man of splendid character and a good citizen. In such circumstances the trial judge was authorized to find that the juror in question did not make the statements attributed to him, and that he was a fair and impartial juror, he having qualified on voir dire. In such cases the trial judge has a discretion, and, as held in *Hall* v. *State,* 141 *Ga.* 7, 9 (80 S. E. 307. "The discretion of a trial judge who passes upon the alleged prejudice and bias of a juror, from conflicting evidence on a motion for new trial, will not be interfered with unless it is manifestly abused. And see the cases cited, supporting that rule. So we reach the conclusion that the trial judge did not abuse his discretion in the instant case in denying the motion for new trial on the foregoing ground.

■ Ground 9 complains of the following charge of the court: "Now the court leaves it to you to say whether or not any confession was made in this case; and if so, was it freely and voluntarily made? If there was no confession made, or if a confession was made not freely and voluntarily, or if it was induced by another by the slightest hope of benefit or remotest fear of injury, then you can not consider such confession in determining your verdict in this case," etc. The entire charge of the court on the subject of con-

fessions was set out in the motion, but we deem it unnecessary to set it out here. Error is assigned because, as is contended, the court should have charged on the distinction between confessions and inculpatory statements, there being no evidence of any statement of the defendant that amounted to more than an inculpatory statement; and that the court should have defined inculpatory statements, so that the jury could determine whether a confession or merely an inculpatory statement had been made. The tenth ground is similar to the ninth and is considered with it. These grounds are without merit. By reading the evidence it is seen that the confessions were freely and voluntarily made, and there was nothing in the evidence to require a charge on inculpatory statements. They were confessions, and, as we have held in a previous division of this opinion, they were freely and voluntarily made; and therefore the court did not err in failing to charge on the subject of inculpatory statements as distinguished from confessions.

■ Complaint is made in ground 11 that the court erred in charging the jury, on the subject of confessions: "Now proof beyond a reasonable doubt of the corpus delicti (that means that the crime charged has been committed—the person named in the indictment has been murdered), proof of that may be, but is not necessarily, sufficient corroboration of a confession." The solicitor-general in opening the case made statements to the effect that he expected to prove the murder of Frances Elder (for which the defendant was not on trial) ; and when the State had rested its case, and counsel for defendant moved for a mistrial (which motion the court overruled), the solicitor-general made this statement prior to the court's ruling, while arguing on the motion, "The evidence shows that the motive and the reason that they killed Frances Elder was to shut her mouth; that this defendant went up there and sat in the car for the purpose, so if anything happened they could get away," this being said in the presence of the jury. It is insisted that the court should have charged further and explained to the jury that the killing of Frances Elder by some one other than the defendant could not be more than a circumstance, and not a part of the corpus delicti; that the statement of the solicitor-general could not but make the jury think that the corpus delicti meant the killing of both Doc Elder and Frances Elder; and that the omission so to explain to the jury was confusing and harm-

ful error to the defendant. There is no merit in this exception. The court had explained that the jury must believe beyond a reasonable doubt that proof had been submitted to them showing the corpus delicti, and by this was meant that the crime charged had been committed and that the person named in the indictment had been murdered. The jury could not have supposed that this meant the killing of Frances Elder, because the court had stated that what was meant was that the person named in the indictment had been murdered, and the person named in the indictment was Doc Elder and not Frances Elder.

■ Ground 12 assigns error on the refusal of a request to instruct the jury as follows: "Drunkenness of the defendant may be looked to by the jury to throw light upon the state of the defendant's mind at the time of the killing, upon the question of malice." It is contended that the jury had a right to consider drunkenness of the defendant upon the question of whether he was guilty or innocent; and that, the court having charged the code section stating when drunkenness might be a complete defense, this request should have been charged in connection therewith, to determine whether or not the defendant actually had any form of malice. It is further contended that the jury in a murder case may, for any reason satisfactory to itself, recommend a life sentence in the event of conviction; and while they might have thought the defendant guilty, the charge requested would have made it plain to them that though such drunkenness might not be enough to acquit the defendant, still drunkenness might be less than that and at the same time warrant the jury in recommending a life sentence, such recommendation being purely a jury question. This ground is without merit. The evidence shows that when the crime was planned to take the life of Doc Elder, the accused, so far as the record discloses, was sober, and there was no evidence to show that the accused was drunk at the time the crime was actually committed, the only evidence on this question being that of witnesses who testified that in his confession the accused stated that he had taken certain whisky. Even if the defendant was drunk at the time of the commission of this homicide, it is well settled in this State that voluntary drunkenness is no excuse for crime. Penal Code (1910), § 39. In *Estes* v. *State, 55 Ga.* 30 (3), it was held: "A person, sober enough to intend to shoot at another, and to actually shoot at and

hit him, without any provocation or justification whatever, is to be deemed sober enough to form the specific intent to murder; and mere drunkenness, whatever its degree, will not negative such intent." There is nothing in the evidence to indicate that the accused was drunk, or, if drunk, that he was made so for the purpose of committing the crime for which he is charged. In *Vann* v. *State*, 83 *Ga.* 44 (6) (9 S. E. 945), it was held: "It was not error to refuse to charge that 'while drunkenness is no excuse for crime, yet it may be considered as to whether the prisoner was excited at the time of the killing by passion or malice.' Simply to prove that a man was drunk and killed another in passion would not reduce the crime from murder to manslaughter." And see *Golden* v. *State*, 25 *Ga.* 527; *Cribb* v. *State*, 118 *Ga.* 316 (8) (45 S. E. 396); *Choice* v. *State*, 31 *Ga.* 424 (7).

We have examined the record in this case carefully, and are satisfied that the accused had a fair and impartial trial according to the laws of this State; and the trial judge being satisfied with the verdict of the jury, and no error of law appearing as having been committed on the trial, the judgment overruling the motion for new trial is *Affirmed. All the Justices concur.*