22259. DeVERE *v.* THE STATE.

DECIDED JUNE 14, 1932.

*Herbert W. Wilson,* for plaintiff in error.

*A. B. Spence,* solicitor-general, *Blalock & Blalock, Jerome Crawley,* contra.

LUKE, J. W. C. DeVere was charged with murder and was convicted of voluntary manslaughter. The first question presented for decision is whether the court erred in overruling a special demurrer to the indictment. The other matters to be passed upon are raised

by the exception to the judgment overruling the motion for a new trial.

Omitting some of its formal parts, the indictment charges that, on July 22, 1931, in Ware county, Georgia, W. C. DeVere "did kill and murder by shoving said J. H. Johnson from an automobile running at a rapid rate of speed and by running and did run and operate said automobile in a manner and way so that said J. H. Johnson was struck and jambed against a concrete post, and did hit, strike, and beat said J. H. Johnson with a certain pistol and a weapon to the grand jury unknown, and thereby giving to the said J. H. Johnson then and there a mortal wound, of which said mortal wound the said J. H. Johnson died."

The gist of the demurrer to the indictment is as follows:

1. "Said indictment fails to advise this defendant respecting the particular allegations therein, the State contends . . that he did kill and murder J. H. Johnson, whether by the alleged 'shoving the deceased from an automobile running at a rapid rate of speed,' or 'by running and did run and operate said automobile in a manner and way so that said J. H. Johnson was struck and jambed against a concrete post,' or 'did hit, strike and beat said J. H. Johnson with a certain pistol and a weapon to the grand jury unknown.' That . . the several allegations respecting the methods, ways, and means by which it is averred the said Johnson was killed and murdered are so general, indefinite, and vague as not adequately and legally advising defendant as to how and in what manner the deceased was killed and murdered. . ."

2. "That the allegations . . that defendant did kill and murder J. H. Johnson 'by shoving said J. H. Johnson from an automobile running at a rapid rate of speed,' are too vague, indefinite, and general to constitute a legal charge of murder; are mere conclusions, stating no particular and definite facts as to enable defendant to prepare his defense . .; they do not allege the speed at which the automobile was running, nor how or in what way or manner said J. H. Johnson was shoved from the same; nor wherein or whereby the shoving of the deceased from the moving automobile occasioned . . the death of the said J. H. Johnson." "That the allegations that the deceased was killed and murdered by the defendant by 'running and did run and operate said automobile in a manner and way so that said J. H. Johnson was struck

and jambed against a concrete post,' are too vague, indefinite, and general to advise defendant of what he is called upon to meet . .; that it is not alleged how the running and operation of the automobile, the manner and way of its operation, did cause the said J. H. Johnson to be struck and jambed against a concrete post; all of such allegations being mere conclusions of the pleader. . ."

"It is a well-settled rule in this State, that the language of an indictment is to be interpreted liberally in favor of the State. Penal Code, § 929; *Studstill* v. *State, 7 Ga.* 2, 16. It follows necessarily from this that a demurrer raising special objections to an indictment should be strictly construed against the pleader." *Green* v. *State,* 109 *Ga.* 536, 540 (35 S. E. 97). "An indictment which charges murder 'by choking and by other means to the grand jurors unknown' is not demurrable on the ground of indefiniteness in the description of the manner of the killing." *Hicks* v. *State,* 105 *Ga.* 627 (31 S. E. 579). In the case last cited the court, in replying to the contention of counsel that "there are many kinds of choking," said (p. 629) : "To 'choke' a person is, in other words, to fill his mouth or throat with a towel or other substance, or to seize and compress his throat, so as to obstruct his breathing. This is what the grand jury meant when they used the word, and that is what the accused must have understood when the presentment was read to him." In *Hall* v. *State,* 133 *Ga.* 177 (65 S. E. 400), it was said: "An indictment charging murder by the defendant stabbing the person killed 'with a certain knife and with other sharp instruments to the grand jury unknown' is not subject to demurrer on the ground that 'this allegation is too general. . .' In *Waller* v. *State,* 164 *Ga.* 128 (138 S. E. 67), it was held that the weapon with which the crime was alleged to have been committed need not be more definitely described than that it was "a piece of iron, . . some blunt instrument, the exact nature of which is unknown to the grand jury." We quote next from *Walker* v. *State,* 141 *Ga.* 525 (81 S. E. 442) : "Under the rulings in *Hicks* v. *State,* 105 *Ga.* 627 (31 S. E. 579), and *Hall* v. *State,* 133 *Ga.* 177 (65 S. E. 400), an indictment which charged that the accused killed and murdered a named woman, 'by then and there choking and beating her and by drowning her and by other violent means to the jurors unknown,' was not demurrable on the ground that it did not set forth with particularity or definiteness

what kind of choking or beating was used, or whether with the hands or some instrument, or the manner of doing it, or upon what person the choking or beating was done. . . Nor was such indictment demurrable on the ground that it did not describe the mode of drowning or the place (other than the county)."

"Where an indictment alleged that the accused killed a woman by shooting her with "a certain pistol and with a certain rifle," it was not error to overrule a demurrer based on the ground that the homicide was charged as committed with two different instruments alleged conjunctively, that it is physically impossible to kill a person with a gun and a pistol at the same time, and that one of them alone must have produced the death. *Walker* v. *State,* 141 *Ga.* 525 (81 S. E. 442), and authorities cited." See also *Knight* v. *State,* 148 *Ga.* 40 (95 S. E. 679). We quote from *Williams* v. *State,* 2 *Ga. App.* 629 (58 S. E. 1071) : "Where every essential ingredient of the offense charged is set forth with sufficient clearness to enable the defendant to prepare his defense, and the jury clearly to understand the nature of the offense, the accusation is not demurrable." See also the recent case of *Walton* v. *State,* 44 *Ga. App.* 298 (161 S. E. 273), where the same rule is applied. Section 954 of the Penal Code (1910), reads: "Every indictment or accusation of the grand jury shall be deemed sufficiently technical and correct, which states the offense in the terms and language of this Code, or so plainly that the nature of the offense charged may be easily understood by the jury. . ." We hold that the indictment in the case at bar is not subject to the demurrer.

Deputy sheriff George L. Mock testified, in substance, that shortly before the homicide he saw policeman J. H. Johnson near a heavily loaded red roadster automobile which was standing on one of the streets of Waycross; that in reply to witness's query as to what he had, Johnson said "a load of liquor;" that the rumble seat of the automobile was up, and witness "saw some bulky sacks in there;" that Johnson spoke to the defendant, W. C. DeVere, and DeVere "got under the wheel," and Johnson got on the left running-board," and the roadster started; that witness followed the car, and saw it pick up speed and swerve, and thought "they were trying to run away" with officer Johnson; that when they got pretty close to the underpass, witness saw Johnson reach in the car, and thought he "was cutting the motor off;" that the car was mak-

ing from forty to fifty miles an hour; that the car cut to the left so as to throw Johnson next to the pillars of the underpass; that Johnson struck one of said pillars and fell off of the running-board a short distance from the underpass; that witness could not tell what happened inside the car, and didn't "see any lick or anything like that;" that witness and others followed defendant's car about twelve miles out the Dixie Highway towards Augusta; that defendant's car left said highway and turned into a dirt road; that witness continued the pursuit, and finally came upon twelve or fifteen cases of liquor which had been recently buried in the woods; that defendant's automobile was found hidden under some broken bushes about two hundred yards from where said whisky was located; that there was some shooting, during which DeVere was wounded, and the defendant and a woman he said was his wife surrendered; and that witness found near the defendant a thirty-eight automatic pistol which had been recently fired.

LeRoy Banks testified that on the day of the homicide he saw "these people" coming across the railroad in a red roadster; that a lady was seated between two men on the seat of the automobile; that the driver of the car had a pistol, but witness did not see him try to use it; and that witness had seen those same people "about fifteen or eighteen days before" going south. Mrs. LeRoy Smith swore in part: "I saw Mr. Johnson up on the car, and I saw those men hit him twice. . . Mr. Johnson was standing on the running-board, and the other men were knocking him, trying to throw him off the running-board. . . I couldn't tell what Mr. Johnson was doing; it looked like he was reaching over in the car. . . I saw the driver strike first. . . I didn't see him (Johnson) pass a lick." Emma Strickland testified: "I could see the underpass, . . it is called Lee Avenue underpass. . . I seen the car with the men in it. . . I saw the man on this side. His hand was going down that way, and Mr. Johnson was going to his knees from the car; . . the man driving had one hand on the steering-wheel, and the other hand was going down with Mr. Johnson. . . Mr. Johnson fell after he passed out from under the underpass. It was the man near this side driving the car. . ." There was testimony that Mr. Johnson's neck and lower spine were broken, and that he had a bruise near his eye, and that he died from his wounds a few hours after he was injured. Mr. E. W. Johnson, a

brother of Mr. J. H. Johnson, testified that the latter made the following statement a few minutes before he died at the hospital: "I am going down a long, long lane, and will never return." Mr. E. W. Johnson further swore: "About that time he told me that they knocked him off the running-board."

The gist of the defendant's statement to the jury was: that officer Johnson arrested him for having whisky, but that he had no whisky; that Johnson got on the running-board of the automobile and directed defendant to drive to the court house or city hall; that defendant was sitting on the left side of the car, and was driving, and his wife was sitting between him and Andrew Norman Persons, the other occupant of the car; that as they started down Lee Avenue, defendant's wife dropped her purse, and he picked it up to hand back to her; that Johnson made a grab for the purse; that defendant was driving the automobile with his left hand, and that while they were each trying to get possession of the purse the car ran close to one of the pillars of the underpass; and that when Johnson hit said pillar "it turned him sidewise, and he kind of fell back on the left rear fender . . and when he cleared the underpass he fell off;" that defendant had nothing against Johnson and never shoved or knocked him off the running-board, and that the occurrence was a pure accident; and that being frightened, and not knowing that Johnson was hurt, and believing that he might shoot into the car where defendant's wife was, he kept going, but without any idea of escaping.

The brief of evidence covers over a hundred pages of closely typewritten matter, and we have not given the testimony of the defendant's witnesses. Neither have we given more than a bare outline of the defendant's statement or of the testimony of the witnesses mentioned. We are satisfied, however, that the evidence supports the verdict.

The first special ground of the motion for a new trial (ground 4) avers that the court erred in allowing the State to introduce testimony as to what happened during the flight of the defendant immediately after the homicide. We are of the opinion that this testimony was admissible to show flight, and to show conduct which might shed some reflected light upon what happened at the time of the homicide, and just prior thereto. The nature of this evidence is sufficiently indicated in our discussion of the general grounds of

the motion for a new trial. We hold that this ground discloses no reversible error.

It appears from ground 5 that LeRoy Banks testified as follows: "I have seen these people before. They came through about fifteen or eighteen days before then, going south, and me and Nathaniel Young was talking to them just below the corner. They asked me—" It appears that the following objection was promptly interposed to the admission of said evidence: "We will object to that question. This happened some two or three weeks before this transaction, and we don't think that it is relevant." The evidence was admitted over that objection. What "people" did the witness have reference to? This question can only be answered with certainty by reference to the rather long brief of evidence. But, if it be assumed that the witness had reference to the defendant and his companions (and he did), how did the testimony injure the defendant's case? The defendant himself stated to the jury: "We left Covington, Kentucky, en route to Jacksonville, Fla., on or about the 11th or 12th of July, 1931; arrived in Waycross . . on the 14th about . . nine o'clock in the morning. Just passed through Waycross on our way to Jacksonville." This ground is entirely without merit.

Special ground 6 avers that "the following evidence . . of the State's witness, E. W. Johnson, was illegally admitted, . . over the objections of movant, to wit." The material portion of his testimony immediately follows: It is: "Well, the way he told me, it happened exactly when he put them under arrest and started with them, that one of them was trying to shoot him, and he reached in there to keep him from shooting him, and the other one knocked him off." The ground then recites that counsel "then and there urged before the court the following objection, . . to wit: If your honor please, I shall interpose my objection at this time to the ruling of the court." Obviously, the ground shows no valid objection to the evidence. Defendant does contend in the ground that "the dying statement of the deceased was prejudicial and hurtful to defendant . . because . . it failed to identify the defendant . . as the perpetrator of the crime, or in any way connected with it." Of course a "contention" in a ground of a motion for a new trial is not an "objection" to evidence. But even were it so considered, it would be entirely without merit. We hold that the court properly overruled this special ground.

It appears from ground 7 that the solicitor-general said: "I will get you to state, Mr. Mock, with reference to the sign over his left eye and the sign over his nose, how would it compare with the butt end of this pistol and the trigger of this pistol?" Upon counsel for defendant stating in effect that the question elicited merely a conclusion of the witness, the court said: "I think the objection is good at this time. You can prove the length of that pistol handle, and prove the length of the scar on his head, and may get it in that way." The ground then recites: "Movant avers that the court, telling the solicitor how to get in said evidence was erroneous and injurious to him, was expressing his opinion as to the evidence and was a violation of section 1058 of the Penal Code of Georgia." We do not think that the objection could be held to be intrinsically good, even if it were in proper shape to be passed upon. However, since counsel had ample opportunity to move for a mistrial, but failed to do so, and, indeed, failed to indicate to the court in any way that he deemed the court's statement objectionable,—the question sought to be raised can not be passed upon. See *Perdue* v. *State,* 135 *Ga.* 277 (69 S. E. 184); *Moore* v. *McAfee,* 151 *Ga.* 270 (11) (106 S. E. 274); *Barnett* v. *Strain,* 151 *Ga.* 553 (5) (107 S. E. 530); *Kay* v. *Benson,* 152 *Ga.* 185 (108 S. E. 779); *Campbell* v. *State,* 155 *Ga.* 127, 128 (116 S. E. 807); *Waddell* v. *State,* 29 *Ga. App.* 33 (5) (113 S. E. 94). The reason for the rule is aptly stated and discussed in the *Campbell* case, supra. There is no merit in this ground. See also *Moss* v. *State,* 43 *Ga. App.* 109 (7) (158 S. E. 461); *Tanner* v. *State,* 163 *Ga.* 121 (9), 130 (135 S. E. 917).

Ground 8 avers that L. A. Fleming and O. T. Wheeler, who sat on the jury which convicted the defendant, were biased and prejudiced and incompetent to act in the case. It is stated that Fleming had said in the presence of L. W. Allen and C. A. Allen that he was on the jury "next week," and that "they ought to electrocute him" (defendant). It is also alleged that "within a few days" after the homicide, juror Fleming made the following statement in regard to the defendant and his party: "The whole damn push ought to be lynched, and if I am selected on the jury to try the defendant I would sit there until hell froze over or give him the chair." Briefly stated, this ground also alleges that the juror O. T. Wheeler had said that "he would like to come in contact with

this party, as he would like to get a shot at him." It is not perfectly clear from the ground whether the foregoing statement had reference to the codefendant, Andrew Norman, or to this defendant, but we shall assume that the reference is to the latter.

The averment as to the first statement attributed to L. A. Fleming is supported by the affidavits of L. W. Allen and C. A. Allen. In rebuttal, the State presented Fleming's affidavit, wherein he deposed that he was perfectly impartial between the State and the accused, and that he positively did not make said statement. The State produced also competent evidence to show that both the Allens had been previously convicted of offenses involving moral turpitude.

The second statement attributed to L. A. Fleming is sought to be proved by the affidavit of J. L. Tyre. This affidavit was also pointedly denied by the counter-affidavit of Fleming. Fleming's good character was also substantiated by numerous affidavits.

The defendant adduced affidavits to sustain its contention that the juror O. T. Wheeler had made the statement attributed to him. Wheeler made a counter-affidavit to the effect that he positively made no such statement, and that he was perfectly impartial in the trial of the case.

"It is well settled that where a verdict is attacked in a motion for a new trial because of the prejudice of a juror, and an issue is formed by the evidence introduced by the parties upon the motion, the judge is the trior, and, unless there is an abuse of discretion, his finding against the movant and in favor of the impartiality of the juror is to be treated as final. Such is the case. *Jefferson* v. *State,* 137 *Ga.* 382 (1) (73 S. E. 499); *Webb* v. *State,* 138 *Ga.* 138 (74 S. E. 1001); *Embry* v. *State,* 138 *Ga.* 464 (2) (75 S. E. 604)." *Patterson* v. *State,* 41 *Ga. App.* 375 (153 S. E. 201). See also *Bradberry* v. *State,* 170 *Ga.* 859 (5) (154 S. E. 344), a case quite similar to the one at bar, where the court reiterated the following rule laid down in *Hall* v. *State,* 141 *Ga.* 7, 9 (80 S. E. 307): "The discretion of a trial judge who passes upon the alleged prejudice and bias of a juror, from conflicting evidence on a motion for new trial, will not be interfered with unless it is manifestly abused."

Under the foregoing authorities we are constrained to hold that the trial judge did not err in overruling special ground 8.

Ground 9 avers that the bailiff in charge of the jury which was trying the defendant "made communication with said jury about the case without permission of the court," and, "while the jury was excused from the courtroom to go to the basement, said bailiff allowed one of the State's witnesses, E. W. Johnson, to go down to the basement also while the jury was there." The single affidavit adduced to prove the allegations made in this ground fails to support the first of these allegations. The second allegation might be dismissed upon the ground that it fails to disclose any sufficient reason for holding that there was injury to the defendant. The affidavit introduced in behalf of the defendant does aver that the bailiff allowed E. W. Johnson to intermingle with the jury in the basement, but Johnson's counter-affidavit contains the following averment: "Deponent avers that such affidavit is a deliberate fabrication. Deponent at no time during the trial of such case went to the basement while the jury or any member thereof was in the basement." We hold that ground 9 is not meritorious.

In "original ground 10" it is averred that two jurors, L. D. James and L. M. James, who sat on the jury which tried the defendant, were disqualified to act as jurors in the case, because they were related within the prohibited degree to J. H. Johnson, deceased, and A. O. James, the prosecutor. It was sought to support this contention mainly by the affidavit of B. S. James, made on January 5, 1932. In this affidavit the affiant went into great detail in stating the various relationships designed to show that said jurors were disqualified. Subsequently "original ground 10" was stricken, and another "ground 10" substituted for it. In this substituted ground the same contention was made, to wit, that said jurors were disqualified because of relationship to A. O. James and J. H. Johnson. In support of this ground the juror made another affidavit, wherein he stated that he "was honestly mistaken as to how the kinship between the Jameses and Johnsons came down," and wherein he undertook to show said kinship in a materially different manner. The defendant introduced other affidavits tending to show that said jurors were disqualified as alleged. The State introduced the affidavit of Mrs. Courtney Johnson, the mother of J. H. Johnson, wherein she stated, among other things, that "the Ray family and James family are not related by blood or marriage." The State adduced other affidavits tending to refute the defendant's claim.

340

As stated in *Dent* v. *State*, 43 *Ga. App.* 153, 154 (158 S. E. 62), "we see nothing to take this case out of the rule that the court is the trior as to the question of relationship, and that, upon conflicting evidence, his finding conclusively determines the issue." In the *Dent* case the following authorities are cited: *Buchanan* v. *State*, 118 *Ga.* 751 (9) (45 S. E. 607); *Johnston-Crews Co.* v. *Smith*, 33 *Ga. App.* 25 (125 S. E. 734); *Johnston-Crews Co.* v. *Smith*, 161 *Ga.* 382 (131 S. E. 65); *Walker* v. *State*, 33 *Ga. App.* 598 (2) (127 S. E. 476). Therefore we hold that special ground 10 is without merit.

*Judgment affirmed. Broyles, C. J., concurs. Bloodworth, J., absent on account of illness.*